**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JORGE CLAUDIO, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | |
| MGS MACHINE CORP., | : | NO. 09-4378 |
| Defendant, | : | |
| | : | |
| v. | : | |
| | : | |
| TASTY BAKING CO., | : | |
| Third-Party Defendant. | : | |

**June _22_ , 2011**                                                    **Anita B. Brody, J.**

<u>**MEMORANDUM**</u>

## I.   Introduction

On February 14, 2008, Plaintiff Jorge Claudio ("Claudio" or "Plaintiff") injured his hand

while operating a cake-packaging machine manufactured by Defendant MGS Machine

Corporation ("MGS" or "Defendant") at a Tasty Baking Company ("TBC") plant. *See* Compl. ¶¶

8, 11, 17, ECF No. 1. Claudio has brought suit against MGS alleging negligence, strict liability

in tort, and breach of warranty. MGS has filed a third-party complaint against TBC, claiming that

TBC should answer for any and all liability that may be entered against MGS by way of sole

liability, joint and several liability, indemnity, and/or contribution. Jurisdiction is proper pursuant

to 28 U.S.C. § 1332.[1] TBC has moved for summary judgment on the grounds that it is immune

from suit as Claudio's employer pursuant to the Pennsylvania Workers' Compensation Act. *See*

77 Pa. Stat. Ann. § 481 (West 2002). For the reasons set forth below, I will grant TBC's motion.

---

[1] *See also* Explanation, May 2, 2011, ECF No. 88.

## II. Background[2]

In June of 2007, Claudio applied and was hired for a position with Accu Staffing Services ("Accu"), a temporary staffing service that places associates with accepted clients throughout southern New Jersey and southeastern Pennsylvania. *See* Claudio Dep. 15:12-17, 39:16-20, Feb. 5, 2010, ECF No. 45; Coward Dep. 11:9-13, May 24, 2010, ECF No. 42. TBC is one such client of Accu, and on occasion requests temporary employees to fill positions at its plant. Coward Dep. 11:14-21; Godun Dep. 27:3-6, June 30, 2010, ECF No. 45. Shortly after hiring Claudio, Accu assigned him to work at TBC as a machine operator. *See* Mot. Summ. J. ¶ 6, ECF No. 42; Claudio Dep. 15:12-17, 39:16-20.

Before beginning work at TBC, Claudio watched a short training video at Accu, filmed at and approved by TBC. Claudio Dep. 41:11-17, 43:15-17; Godun Dep. 57:10-15. During his first week at TBC, Claudio shadowed and received guidance from a female TBC employee. Claudio Dep. 61:14-62:24, 63:11-64:14; Mem. Supp. Mot. Summ. J. 6, ECF No. 42. In later weeks, there was a "First Friday Safety Breaks" program; TBC provided the location and refreshments, and encouraged agency workers to spend their break reviewing safety topics and watching videos from the Accu library. Godun Dep. 34:1-35:24. As a general matter, TBC set safety regulations, which Accu distributed. Rasheed Dep. 10:4-10, June 11, 2010, ECF No. 42. Accu employees also occasionally visited the TBC plant to provide "initial training" and "cursory orientation." Coward Dep. 17:22-23.[3]

---

[2] On a motion for summary judgment, the facts are interpreted in the light most favorable to the nonmoving party. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). Where the non-moving party has denied a fact but failed to cite to the record, I have turned to the supporting materials in accordance with Federal Rule of Civil Procedure 56(c) and (e).
[3] The deposition of Grant Coward, Risk Manager and Workers' Compensation Coordinator at Accu, indicates that between the summer of 2006 and February of 2008, he visited the TBC plant six times for the purposes of "initial training for some of our employees" and "cursory orientation." Coward Dep. 17:7-23. More specifically, the training consisted of "walking the working surfaces, hazard communications, proper personal protective equipment to be wearing; anything that . . . [Accu] wanted to emphasize to all of the associates." *Id.* at 18:2-7. During these sessions, employees were told that they could report safety hazards to "their department head, their immediate supervisors,

While working at TBC, Claudio reported for duty to Syid Rasheed ("Rasheed"), an Accu employee. Claudio Dep. 54:11-15. Rasheed took attendance and reported the workers' hours to Accu for its payroll records. Mot. Summ J. ¶ 7; Rasheed Dep. 7:7-10:10; Claudio Dep. 54:11-15. Rasheed then told Claudio his floor assignment, which was determined by TBC. Claudio Dep. 45:20-46:1, 56:19-24; Godun Dep. 58:23-59:7; Mem. Supp. Mot. Summ. J. 8; Answer 14, ECF No. 45. Other than Rasheed, no one from Accu gave Claudio directions or orders during the course of the day. Claudio Dep. 69:20-24.

Claudio typically worked on the sixth floor of the TBC plant. *Id*. at 57:9-11. Eventually, Claudio received an identification card that read "Accu Staffing" but also bore a Tasty Kake logo. *Id*. at 48:23-49:1, 49:6-14. With the card, Claudio could swipe in at the sixth floor time clock. *Id*. at 49:23-50:2. TBC employees had different identification cards but swiped in using the same machine. *Id.* at 53:15-54:9.

On the sixth floor, TBC supervisor Linda Bartholomew ("Bartholomew") would describe to Claudio his daily duties. *Id*. at 57:1-5, 57:24-58:2. On occasion, Bartholomew changed Claudio's assignment, sending him to work on the fifth floor where he received subsequent instruction from another TBC employee, Billy. *Id*. at 57:6-58:21, 75:5-21. Normally, however, Bartholomew would give Claudio a specific job and assign him to a machine. *Id*. at 60:11-22. If Claudio ever had a problem with his assigned machine, he was to report back to Bartholomew. *Id*. at 63:1-10. If Bartholomew was not present, another TBC supervisor, Rose, would give Claudio this guidance. *Id*. at 68:4-16. In general, TBC supervisors demonstrated to Accu employees how to do the work, and could correct them when wrong. *Id*. at 127:21-128:8;

---

Mr. Rasheed; whoever may have been in the position of authority at that particular time and that particular place."
*Id.* at 18:10-22.

Bartholomew Dep. 72:17-73:3, June 11, 2010, ECF No. 42. TBC supervisors also determined

how long Accu employees spent on their tasks. Bartholomew Dep. 72:20-23.[4]

Throughout the plant, Accu employees typically wore blue jumpsuits whereas TBC

employees wore white uniforms with "Tasty Kake" written on them. Claudio Dep. 52:20-53:14.

Both groups also wore brown jumpsuits on occasion, but the TBC employees' brown jumpsuit

always bore a Tasty Kake logo. *Id*. at 55:6-24. TBC dictated what other clothing was acceptable

while operating the machinery. Mem. Supp. Mot. Summ. J. 6; Claudio Dep. 123:3-125:4.

At all times material to this controversy, Accu paid Claudio. Mot. Summ. J. ¶ 8; Claudio

Dep. 46:20-23. TBC could discipline Claudio in conjunction with Accu. Coward Dep. 128:19-

129:6; *see also* Claudio Dep. 65:23-66:23; Reply 2, ECF No. 46.[5] TBC had the authority to end

Claudio's assignment with TBC, at least in certain situations. Coward Dep. 125:7-20; Godun

Dep. 60:4-24; *see also* Claudio Dep. 66:8-23.[6] At the same time, TBC coordinated such

---

[4] At his deposition, Coward agreed that TBC and its employees were "the one[s] to tell Mr. Claudio what needed to get done every day," that "they direct[ed] him as to how the work was to be done," that "if Mr. Claudio wasn't doing the job correctly, . . . they [had] the right to go up to him and say you're doing this the wrong way," and that "that [was] expected by Accu." Coward Dep. 127:9-128:8. Bartholomew concurred that TBC supervisors told Accu employees "how to do the work" as well as "what work to do and how long to do it," and that "if they weren't doing the job right, these Tasty supervisors [would] tell them to do it better or differently." Bartholomew Dep. 72:17-73:33.

[5] According to Coward, if Claudio "broke a Tasty Baking Company rule while he was on premises," TBC would let Accu "know what the infraction may have been, how serious the infraction was and simply coordinate just what type of disciplinary action, if any, needed to be taken." Coward Dep. 128:9-11, 128:21-129:1. Claudio stated that "if one of the Accu Staffing workers was doing a bad job or disobeying orders or something like that," then "Linda would deal with it, and then she would call Syid and complain to him about it." Claudio Dep. 65:23-66:7.

[6] Coward agreed that "if Tasty Baking Company was dissatisfied with Mr. Claudio's work, . . . it [had] the ability to say I don't want him working here anymore." TBC would "communicate that to Mr. Rasheed," and "just say we don't want him." According to Coward, "his assignment would be ended." Coward Dep. 125:7-20. Alexander Godun, Senior Manager of Human Resources and Labor Relations for TBC, was asked "who had the final say as to whether the Accu Staffing employee would be welcomed back to Tastykake to work," and "whose decision [it] would . . . be, if there was a problem with an Accu Staffing employee while working at Tastykake, as to whether or not Tastykake would want to keep that person." Godun Dep. 60:4-15. In response, Godun stated that "it would depend on the nature of the problem. If there was an instance when there was a work-related problem, then it would be Tastykake's decision to ask for them not to be assigned there. If there was another issue, there have been times when Accu Staffing took the lead . . . ." *Id.* 60:17-24. Claudio also recalled times where Bartholomew "fire[d] somebody or removed them from the floor," telling them "you have to go, just go, go see Syid." Claudio Dep. 66:8-23.

4

decisions with Accu. Coward Dep. 141:1-22; *see also* Godun Dep. 60:4-24.[7] TBC could not

single-handedly terminate Claudio's employment with Accu; he would be terminated by Accu

for cause, but TBC could play a role. Coward Dep. 125:20-21, 141:8-22; *see also* Reply 2.[8]

On February 14, 2008, Claudio injured his hand at the TBC plant, while operating a cake-

packaging machine manufactured by Defendant MGS. *See* Compl. ¶¶ 8, 11, 17. On March 12,

2008, Claudio filed a claim with the Bureau of Workers' Compensation against both TBC and

Accu for the damages he sustained. Mem. Supp. Mot. Summ. J. 10; Mot. Summ J. Ex. I; *id*. Ex.

J. In response, TBC filed an answer and, on March 27, 2008, wrote to the judge that TBC was

not Claudio's employer. Mem. Supp. Mot. Summ. J. 10; Mot. Summ. J. Ex. H. Specifically, the

letter read, "Most importantly, Jorge Claudio is <u>not</u> an employee of the Tasty Baking Company,

but rather is employed by Accu Staffing . . . . Please accept this letter as a Motion to Dismiss the

Tasty Baking Company from the Claim Petition litigation before you." Mot. Summ. J. Ex. H. On

May 8, 2008, Claudio advised the judge that "Defendant/Employer [Accu Staffing] ha[d]

accepted the claim" and requested that the court "please mark the Claim Petition withdrawn." *Id.*

Ex. I. Pennsylvania Workers' Compensation Judge Marc I. Harrison then issued an order stating

that "[t]he Claim Petition filed by Claimant on March 12, 2008 is **WITHDRAWN** based upon

the representations of Claimant's counsel in a May 8, 2008 letter." *Id.* Ex. J.

---

[7] Coward stated that TBC "would coordinate the ending of [a] person's assignment, allowing Accu to reassign that person to another client." Coward Dep. 141:19-22.

[8] In Coward's words, "He would not be terminated by Accu Staffing unless it was for cause." Coward Dep. 125:20-21. In response to the question, "Would it be correct to say then that Tasty Baking would not have the authority to lay these people off?," Coward answered, "Not without coordination through Accu." *Id*. 141:8-12. Coward also agreed that "if Tasty Baking became dissatisfied with someone's job performance, they couldn't just terminate them unless they also coordinated that with Accu Staffing." *Id.* 141:13-17. Although the details surrounding discipline, discharge, and termination are not entirely clear, they are not ultimately dispositive in the resolution of TBC's motion. *See infra* Part IV.A.

Accu, through its insurance company, paid workers' compensation benefits to Claudio. Mem. Supp. Mot. Summ. J. 8; Claudio Dep. 28:3-9. Accu typically provides workers' compensation benefits to the workers it supplies to TBC. Coward Dep. 24:15-19.

### III. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Kornegay v. Cottingham*, 120 F.3d 392, 395 (3d Cir. 1997). A fact is "material" if the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of demonstrating that there are no material facts supporting the nonmoving party's legal position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party cannot rely upon "bare assertions, conclusory allegations or suspicions" to support its claim. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Rather, the party opposing summary judgment must go beyond the pleadings and present evidence, through affidavits, depositions, or admissions on file, to show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

The threshold inquiry at the summary judgment stage involves determining whether there is the need for a trial, that is, "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## IV. Discussion

TBC argues that it is immune from liability under the Pennsylvania Workers' Compensation Act as Claudio's employer. MGS counters that TBC was not Claudio's employer and is therefore not immune. MGS also asserts that TBC should be judicially estopped from presenting itself as Claudio's employer in light of prior statements to the contrary. The evidence of record supports TBC's positions, namely that TBC employed Claudio and should not be judicially estopped from so claiming.

### A. TBC as Claudio's Employer

TBC moves for summary judgment on the grounds that it is immune from liability as Claudio's employer pursuant to the terms of the Pennsylvania Workers' Compensation Act.

The Pennsylvania Workers' Compensation Act "grants employees the right to a fixed level of compensation for work-related injuries and, in return, exempts their employers from common law liability for negligence." *Mathis v. United Eng'rs & Constructors, Inc.*, 554 A.2d 96, 101 (Pa. Super. Ct. 1989). Thus, liability under the Act is to be exclusive, and employers are not to be liable to employees "in any action at law or otherwise on account of any injury or death . . . or occupational disease." 77 Pa. Stat. Ann. § 481(a) (West 2002); *see also Black v. Labor Ready, Inc.*, 995 A.2d 875, 876 n.3 (Pa. Super. Ct. 2010) ("'Where an employee's injury is compensable under the Act, the compensation provided by the statute is the employee's exclusive remedy against his or her employer. Thus, an injured employee cannot maintain a tort

action against his or her employer if the injury is compensable under the provisions of the Act.'"

(quoting *Albright v. Fagan*, 671 A.2d 760, 762 (Pa. Super. Ct. 1996))).

This immunity extends to employers impleaded for purposes of contribution or indemnity: "In the event injury or death to an employe is caused by a third party, then such employe . . . may bring their action at law against such third party, but the employer . . . shall not be liable to a third party for damages, contribution, or indemnity in any action at law . . . ." 77 Pa. Stat. Ann. § 481(b); *see also Lackie v. Niagara Mach. & Tool Works*, 559 F. Supp. 377 (E.D. Pa. 1983).

The Act references and defines the term "employer" in §§ 21[9] and 52.[10] *See Martin v. Recker*, 552 A.2d 668, 671 (Pa. Super. Ct. 1988). In addition, Pennsylvania courts have held that the borrowed employee doctrine is relevant to the determination of employer status for purposes of the Workers' Compensation Act. According to that doctrine,

> [t]he test for determining whether a servant furnished by one person to another becomes the employee of the person to whom he is loaned is whether he passes under the latter's right of control with regard not only to the work to be done but also to the manner of performing it. The entity possessing the right to control the manner of the performance of the servant's work is the employer, irrespective of whether the control is actually exercised. Other factors which may be relevant include the right to select and discharge the employee and the skill or expertise required for the performance of the work. The payment of wages may be considered, but is not a determinative factor. Although the examination of these

---

[9] "The term 'employer,' as used in this act, is declared to be synonymous with master, and to include natural persons, partnerships, joint-stock companies, corporations for profit, corporations not for profit, municipal corporations, the Commonwealth, and all governmental agencies created by it." 77 Pa. Stat. Ann. § 21. "Under the Workmen's Compensation Act, the term 'employer' and 'employee' are synonymous with 'master' and 'servant,'" hence the invocation of the common law borrowed servant doctrine to define employers under the Act. *Wilkinson v. K-Mart*, 603 A.2d 659, 661 (Pa. Super. Ct. 1992) (citing *Cookson v. Knauff*, 43 A.2d 402, 405 (Pa. Super. Ct. 1945); and *Ashman v. Sharon Steel Corp.*, 448 A.2d 1054, 1059 (Pa. Super. Ct. 1982)).

[10] "An employer who permits the entry upon premises occupied by him or under his control of a laborer or an assistant hired by an employe or contractor, for the performance upon such premises of a part of the employer's regular business entrusted to such employe or contractor, shall be liable to such laborer or assistant in the same manner and to the same extent as to his own employe." 77 Pa. Stat. Ann. § 52. "[T]his provision typically applies to the construction industry" and "speaks to a situation where a general contractor subcontracts work to others, and the injured employee of the subcontractor seeks to bring an action in trespass against the general contractor." *Martin v. Recker*, 552 A.2d 668, 672 (Pa. Super. Ct. 1988).

factors guides the determination, each case must be decided on its own facts.

*JFC Temps, Inc. v. Workmen's Comp. Appeal Bd.*, 680 A.2d 862, 864 (Pa. 1996) (internal

citations omitted). The Pennsylvania Supreme Court has concluded that "the right to control the

performance of the work is the overriding factor." *Id.* at 865; *see also Mature v. Angelo*, 97 A.2d

59, 60 (Pa. 1953).[11]

As a general matter, the issue of whether an employer is entitled to immunity under the

Workers' Compensation Act "is properly the subject of a motion for summary judgment, as

'whether the facts as they are determined to exist constitute an employment relationship is

---

[11] *JFC* represents the Pennsylvania Supreme Court's most recent statement of the borrowed employee doctrine, and appears to condense previous versions. In 1953, for example, the court wrote that the following were governing principles:

> 1. One who is in the general employ of another may, with respect to certain work, be transferred to the service of a third person in such a way that he becomes, for the time being and in the particular service which he is engaged to perform, an employe of that person.
> 2. The crucial test in determining whether a servant furnished by one person to another becomes the employe of the person to whom he is loaned is whether he passes under the latter's right of control with regard not only to the work to be done but also to the manner of performing it.
> 3. A servant is the employe of the person who has the right of controlling the manner of his performance of the work, irrespective of whether he actually exercises that control or not.
> 4. Where one is engaged in the business of renting out trucks, automobiles, cranes, or any other machine, and furnishes a driver or operator as part of the hiring, there is a factual presumption that the operator remains in the employ of his original master, and, unless that presumption is overcome by evidence that the borrowing employer in fact assumes control of the employe's manner of performing the work, the servant remains in the service of his original employer.
> 5. Facts which indicate that the servant remains the employe of his original master are, among others, that the latter has the right to select the employe to be loaned and to discharge him at any time and send another in his place, that the lent servant has the skill of a technician or specialist which the performance of the work requires, that the hiring is at a rate by the day or hour, and that the employment is for no definite period.
> 6. The mere fact that the person to whom a machine and its operator are supplied points out to the operator from time to time the work to be done and the place where it is to be performed does not in any way militate against the continuance of the relation of employe and employer between the operator and his original master.
> 7. Where the facts are not in dispute, and the evidence leaves no sufficient ground for inconsistent inferences therefrom, the question as to who is the servant's employer is a matter for the determination of the court, but, where the evidence presents an issue of fact, or different inferences can reasonably be drawn therefrom, the question is one for determination by the jury.

*Mature*, 97 A.2d at 60-62 (internal citations omitted); *see also Williams v. Delta Truck Body Co.*, 892 F.2d 327, 330 (3d Cir. 1989). The Third Circuit adopted the *Mature* principles prior to the *JFC* decision but, consistent with *JFC*, emphasized that "'it is enough to establish the employer-employee relationship if the employer has the right to control the employee's manner of performance of work, regardless of whether the right is ever exercised.'" *Williams*, 892 F.2d at 330 (quoting *Daily Express, Inc. v. Workmen's Comp. Appeal Bd.*, 406 A.2d 600, 602 (Pa. Commw. Ct. 1979)).

strictly a question of law.'" *Wilkinson v. K-Mart*, 603 A.2d 659, 660-61 (Pa. Super. Ct. 1992)

(quoting *Keller v. Old Lycoming Twp.*, 428 A.2d 1358, 1361 (Pa. Super. Ct. 1981)); *see also*

*JFC*, 680 A.2d at 864 ("The question of whether an employer-employee relationship exists is one

of law, based upon findings of fact."); *Mature*, 97 A.2d at 61 ("[T]he question as to who is the

servant's employer is a matter for the determination of the court."); *English v. Lehigh Cnty.*

*Auth.*, 428 A.2d 1343, 1348 (Pa. Super. Ct. 1981).

In this case, TBC held the right to control the performance of Claudio's work. As laid out

above, TBC told Rasheed where to send Claudio, and Bartholomew, a TBC Supervisor,

reassigned Claudio when necessary. Once on a floor, TBC employees managed Claudio's tasks.

Bartholomew gave Claudio specific jobs and sent him to certain machines, and received

complaints from Claudio when those machines were not working properly. Rose gave Claudio

instruction in Bartholomew's absence. Both could correct Claudio when his methods were

improper. These facts indicate that TBC controlled the work to be done and the manner of

performing it. Thus the overriding factor in the borrowed employee analysis reveals TBC to be

Claudio's employer.

Moreover, other considerations similarly point to TBC as Claudio's employer. For

instance, TBC provided a full week of training to Claudio, dictated what clothing he could wear,

and placed its logo on his identification card. TBC could also end Claudio's assignment at the

plant in certain circumstances if dissatisfied with his work.

MGS submits that Accu never relinquished control over its workers, as evidenced by the

fact that Claudio had to report to Rasheed, an Accu employee, daily, and that Accu as opposed to

TBC investigated his injury. MGS also suggests as considerations that Accu hired Claudio, paid

his salary and workmen's compensation benefits, and maintained a role in disciplining and

terminating him. Accu also played a part in Claudio's training and appeared on his identification card, and Accu employees were distinguishable from TBC employees at the plant due to different uniforms.

However, the law is clear that the considerations emphasized by MGS are of limited weight. "The payment of wages is not a decisive factor," nor is who does the hiring. *Venezia v. Phila. Elec. Co.*, 177 A. 25, 26 (Pa. 1935). Furthermore, when one employer's activities are "confined to seeing that the men were on hand and checking the time they worked," that is "far from indicating that [it has] any control or right of control over them as to the manner in which they [do] their work." *Id.* Along those same lines, other cases have noted that "record-keeping and insurance coverage functions are peripheral matters which do not control the determination" of who is a plaintiff's employer, and that "under the Workmen's Compensation Act, the fact that the 'lending employer' pays for Workmen's Compensation insurance is no impediment to finding the 'borrowing employer' to be immune from suit." *Supp v. Erie Ins. Exch.*, 479 A.2d 1037, 1040-41 (Pa. Super. Ct. 1984).[12] Thus even though Accu hired and paid Claudio, and even

---

[12] A few Pennsylvania Commonwealth Court cases have held that an employee can have more than one employer under the Workers' Compensation Act, and that all employers are then entitled to immunity. *See Temple v. Milmont Fire Co.*, 525 A.2d 848, 849-50 (Pa. Commw. Ct. 1987) ("Whether an injured employe may have more than one employer under the Act is raised here as an issue. Our reading of the Act, and research into the interpretative case law, convinces us that an employe may have more than one 'employer' for purposes of the Act. . . . Therefore, injured volunteer firemen may have two employers for purposes of the Act, the actual employer under whose supervision the fireman was working at the time of the injury, and the statutory employer, i.e., the municipality, upon whom rests the responsibility for providing workmen's compensation benefits . . . ."); *Merryman v. Farmington Volunteer Fire Dept.*, 572 A.2d 46, 48 (Pa. Commw. Ct. 1990) (declining to overrule *Temple* and its holdings "that an injured employee may have more than one employer under the Act" and "that as long as the injured worker is provided with workmen's compensation benefits by some employer all such employers under the Act are entitled to the grant of immunity"); *see also Pastore v. Anjo Constr. Co.*, 578 A.2d 21, 25 (Pa. Super. Ct. 1990) (citing *Temple* for the proposition that an "[e]mployee may have more than one employer under the Workmen's Compensation Act" and that "all such employers under the Act are entitled to immunity"). On the other hand, one district court distinguished *Temple* and *Merryman* as "rest[ing] on the unique public policy relating to volunteer fire and rescue companies" and declined to interpret them as holding more broadly that any employee may have more than one employer under the Act. *See Sklodowski v. Isaac Watkin Co.*, No. 90-3637, 1991 U.S. Dist. LEXIS 18760, at *12 (E.D. Pa. Dec. 17, 1991). In addition, several Pennsylvania Superior Court cases have implied that either the lending employer or the borrowing employer is the employer for purposes of Workers' Compensation Act immunity, not both. *See Wilkinson*, 603 A.2d at 439-40; *English*, 428 A.2d at 1346, 1349 (choosing between lending and borrowing employer); *Keller*, 428 A.2d at 1360 (same). Regardless of whether two employers can claim

though Rasheed took his attendance and recorded his time, this arrangement does not compel the conclusion that TBC cannot be Claudio's employer for purposes of immunity under the Workmen's Compensation Act.

Rather, the overriding consideration is who could control the work to be done and the manner of performing it, rights that TBC indisputably held. *JFC Temps, Inc. v. Workmen's Comp. Appeal Bd.*, 680 A.2d 862, 864-65 (Pa. 1996); *see also Pryce v. D. Jackson & Assocs.*, No. 95-4417, 1997 U.S. Dist. LEXIS 8842, at *15-16 (E.D. Pa. June 23, 1997) (rejecting "plaintiff's contention that other factors, such as hiring, right to terminate employment and payment of wages and compensation, should be considered in determining plaintiff's status as an employee" and concluding that defendant's "right to control plaintiff's performance is so clear that additional factors, which might be relevant to establishing an employment relationship in a more questionable situation, cannot overcome our legal conclusion that an employment relationship existed between [plaintiff and defendant] at the time of the accident."). By creating assignments for Claudio and instructing him how to accomplish them, TBC exercised the dispositive control.

The borrowed employee doctrine thus indicates that TBC was Claudio's employer. As a result, pursuant to the Workers' Compensation Act, TBC is immune from common law liability and cannot be held responsible to MGS for indemnity or contribution.

### B. Judicial Estoppel

In response to TBC's Motion for Summary Judgment, MGS argues primarily that TBC should be judicially estopped from asserting that it was Claudio's employer.

---

immunity, the weight of authority indicates that an employer who does not pay workmen's compensation benefits can nevertheless claim immunity under the Act. Furthermore, all of these cases support a finding of immunity for TBC.

"Under the doctrine of judicial estoppel, a court can defend the integrity of the judicial process by barring a party from taking contradictory positions during the course of litigation." *G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 261 (3d Cir. 2009). "Though there is no rigid test for judicial estoppel, three factors inform a federal court's decision whether to apply it: there must be (1) irreconcilably inconsistent positions; (2) adopted in bad faith; and (3) a showing that estoppel addresses the harm and no lesser sanction is sufficient." *Id.* at 262 (internal quotations omitted).[13] Bad faith for judicial estoppel purposes has been defined as an "intent to play fast and loose with the court," *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir. 1996), and therefore does not exist when "inconsistent positions are asserted in good faith or through inadvertence," *In re Chambers Dev. Co.*, 148 F.3d 214, 229 (3d Cir. 1998). Bad faith is also typically not found when the inconsistent positions advanced represent legal theories rather than factual matters. *See Palcsesz v. Midland Mut. Life. Ins. Co.*, 87 F. Supp. 2d 409, 413 (D.N.J. 2000) ("[C]ourts have been reluctant to apply judicial estoppel where a statement contains a legal conclusion, as distinguished from a purely factual inconsistency." (citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999))); *see also Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996) ("[T]he position sought to be estopped must be one of fact rather than law or legal theory."). Finally, "a party has not displayed bad faith for judicial estoppel purposes if the initial claim was never accepted or adopted by a court or agency." *Montrose Med. Grp. v. Bulger*, 243 F.3d 773, 778 (3d Cir. 2001); *see also G-I Holdings*, 586 F.3d at 262 ("J]udicial estoppel is generally not appropriate where the defending party did not convince [a court or

---

[13] Contrary to the assertions of the parties, federal law governs judicial estoppel analysis in this circuit. *G-I Holdings*, 586 F.3d at 261 ("We have long avoided deciding whether federal judicial estoppel law applies in diversity cases. But today we weigh in, as we believe that a federal court's ability to protect itself from manipulation by litigants should not vary according to the law of the state in which the underlying dispute arose. In so doing, we follow five other Courts of Appeals." (internal citations and quotation omitted)). For this reason, the analysis that follows does not engage with the state court cases cited by the parties.

agency] to accept its earlier position.").[14] As an overarching principle, "judicial estoppel is an extraordinary remedy to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice." *Ryan*, 81 F.3d at 365 (internal quotation omitted).[15]

In this case, judicial estoppel would be inappropriate. Admittedly, TBC has advanced inconsistent positions, writing to the Workers' Compensation Judge that it was not Claudio's employer while asserting now that it was Claudio's employer. However, there is no indication of bad faith, or an intent to play fast and loose with the court, on the part of TBC. Rather, TBC has suggested that it changed its position in light of facts uncovered through discovery, indicating good faith or inadvertence. *See* Mem. Supp. Mot. Summ. J. 12. Furthermore, assertions as to TBC's status as Claudio's employer represent largely legal conclusions, making judicial estoppel all the less appropriate in this situation. Finally, TBC's previous position that it was not Claudio's employer was never accepted or adopted by any tribunal. Instead, Claudio withdrew his claim, and the Workers' Compensation Judge issued an order giving effect to that request. In sum, there is no evidence of bad faith on the part of TBC, and this case does not merit the invocation of an extraordinary remedy to prevent a miscarriage of justice.

---

[14] In *G-I Holdings*, 586 F.3d at 262, the Third Circuit cautioned, "We do not mean to suggest that where no court has accepted an initial position, judicial estoppel can never apply. We will apply it to neutralize threats to judicial integrity however they may arise." Yet the court also concluded that "[b]ecause the Court never relied on [the defendant's] first position, we shall not bar its new one." *Id.* Thus it appears that while in extraordinary circumstances courts can invoke judicial estoppel to protect judicial integrity even when an earlier inconsistent position was not accepted or adopted, perhaps in instances where bad faith is otherwise obvious and extreme, by and large arguments never relied on by a court should not give rise to an application of the doctrine. As in *G-I Holdings*, in this case, no tribunal ever relied on TBC's first position, so I will not bar its new one. Further, I find no extraordinary circumstances, or other need to protect judicial integrity, such that judicial estoppel should apply even though TBC's previous position was never accepted or adopted by the Workers' Compensation Judge.

[15] *See generally Chao v. Roy's Constr. Inc.*, 517 F.3d 180, 186 n.5 (3d Cir. 2008) ("Supreme Court and Third Circuit precedent demonstrate that some aggravating factor, and not mere inconsistency, is necessary for the application of judicial estoppel. . . . Not only must the court find that a party adopted inconsistent positions, but it should also consider whether the party succeeded in convincing a tribunal to accept its position and whether the party would derive an unfair advantage in the absence of estoppel. . . . We have also endorsed the view that judicial estoppel is an extreme remedy, to be used only when the inconsistent positions are tantamount to a knowing misrepresentation to or even fraud on the court." (internal quotations omitted)).

In conclusion, TBC should not be judicially estopped from asserting that it was Claudio's employer for purposes of Workers' Compensation Act immunity. Rather, the evidence indicates that TBC was Claudio's employer and is entitled to such immunity.

**V.     Conclusion**

For the foregoing reasons, I will grant TBC's Motion for Summary Judgment.

_____ s/ Anita B. Brody_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:     Copies **MAILED** on _____ to: